HUGH M. BENNETT, JR. AND JACKLYN R. BENNETT, ET AL. [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bennett v. Commissioner
Docket Nos. 29028-81, 29029-81, 29030-81, 29259-81.
United States Tax Court
T.C. Memo 1987-167; 1987 Tax Ct. Memo LEXIS 163; 53 T.C.M. (CCH) 472; T.C.M. (RIA) 87167; March 26, 1987. *163 Jack D. Farris and Lynn Bencowitz, for the petitioners. Marion K. Mortensen, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined that deficiencies in income tax and an addition to tax were due from petitioners as follows: Addition to Tax
Petitioners
Docket No.
Years
Deficiency
Section 6651(a)
Hugh M. Bennett &
29028-81
1974
$137,615
Jacklyn R. Bennett
1975
39,768
1976
83,217
Robert L. O'Dell &
29029-81
1974
130,032
Carol E. O'Dell
1975
16,729
1976
180,588
C.A.O. Corporation
29030-81
3/31/77
394,149
$98,384
Byron D. Frankenberger &
29259-81
1974
134,570
Beverly J. Frankenberger
1975
36,465
After concessions, the issues remaining for decision are: (1) whether certain payments made in 1974 by F.O.B., a limited partnership, to a farming corporation were for growing crops and prepaid cattle feed rather than loans; (2) if so, whether the payments by F.O.B. are deductible in 1974; (3) whether petitioners have substantiated the amount paid by F.O.B. in 1975 to the farming corporation for its cattle operations; *164 and (4) whether the payments made in 1975 by F.O.B. to the farming corporation are deductible farm expenses. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference. At the time their petitions were filed all of the individual petitioners resided in and petitioner C.A.O. Corporation (C.A.O.) had its principal place of business in California. Each pair of individual petitioners filed joint income tax returns on the cash basis for the taxable years in issue with the Internal Revenue Service Center at Ogden, *165 Utah. C.A.O. filed a corporate return on the same basis and at the same place for its fiscal year ending on March 31, 1977. For some time prior to the years in issue, Bennett, [4] O'Dell, and Frankenberger owned and operated Conic Corporation in San Diego. In September 1974, they sold their stock in Conic Corporation and realized the following long term capital gains: Petitioner
Gain Realized
Bennett
$762,471
O'Dell
737,855
Frankenberger
745,439
At or about the date of their sale of Conic Corporation Bennett, O'Dell and Frankenberger began to consider the feasibility of investing their gains from the sale with Jackson Enterprises, a corporation which was farming approximately 14,000 acres in the Imperial Valley. They were particularly interested in the operations being carried out by two of the corporation's divisions, Jackson Farming and Jackson Feed Mill, and learned that Jackson Enterprises was actively seeking investors for these two divisions because their activities were hampered at that time by poor lines of credit. From further investigation *166 they learned that Jackson Farming was engaged in the business of growing alfalfa, asparagus, beets, onions, wheat, cotton, spring cantalopes, tomatoes and milo. The crops were grown either on behalf of Jackson Enterprises or for investors. In some instances, a particular crop or crops would be inventoried; i.e., Jackson Farming would rent the land and prepare it for planting, plant the crop or crops, and provide any necessary cultivation and other growing costs until such time as an investor, either an individual or a group, was located. At that time the investor would be given an invoice for expenses already paid or incurred to that point by Jackson Farming on the inventoried crop plus a budget for the estimated expenses of the balance of the crop year. At the end of the crop year, Jackson Farming would harvest and sell the crop, reconcile the budgeted expenses to the actual expenses and any difference would be added to or deducted from the profits from the crop. Bennett, O'Dell and Frankenburger also learned that Jackson Feed Mill, the other division of Jackson Enterprises, was engaged in purchasing, fattening and reselling cattle. In this operation, cattle were purchased, usually *167 in Mexico, by Jackson Feed Mill and shipped to its feed lots in Imperial Valley. There the cattle were individually weighed, placed in numbered feed lots and started on a feeding program of hay, grain, milo, and other substances. Sometimes, during the program, cattle were also placed on pasture. Any feed, including pasture, medicine or other items of expense furnished to any lot of cattle were indicated on that lot's weight ticket and all paperwork, such as copies of bills of sale, drafts, weight tickets, receiving slips, etc., were accumulated in a "lot folder." Upon their receipt Jackson Feed Mill would attempt to sell each lot of cattle to an investor. However, if no sale occurred, Jackson Feed Mill would "warehouse" the cattle, i.e., it would start to finish them out at its own expense and, if no investor appeared, would eventually sell them for slaughter. When a lot of cattle which had been warehoused was purchased by an investor, the lot number was changed to reflect the new ownership and the sale was reflected in the records of Jackson Feed Mill. If he chose to do so an investor could prepay Jackson Feed Mill for the estimated cost of feeding his cattle. In this case *168 the investor's prepaid feed expense was charged as the feed was consumed; otherwise, the investor was billed monthly for the feed. Each investor was billed monthly for any other expenses such as medical costs and head day taxes. [5] All expenses were summarized and recorded monthly in Jackson Feed Mill's records. When a lot of cattle owned by an investor was sold, the cattle were weighed, the weight was recorded on a weight ticket and a bill of sale was drawn. The weight tickets and bills of sale were placed in the lot folder and the sale was recorded in Jackson Feed Mill's sales journal. After each such sale, a schedule summarizing the lot's feeding results for the period during which the cattle were in the lot was prepared by Jackson Feed Mill. If a lot of cattle was sold to an investor after a feeding program was underway, only the investor's lot number and not that of Jackson Feed Mill would appear on the summary. After negotiations with Jackson Enterprises regarding its farming and feeding operations, Bennett, O'Dell, and Frankenberger entered into a limited partnership agreement *169 with Jackson Enterprises. In the limited partnership which was known as F.O.B. Ltd. (F.O.B.), Jackson Enterprises was the general partner and Frankenberger, O'Dell and Bennett were limited partners. The partnership agreement was dated December 1, 1974, and was signed by petitioners on December 23, 1974. According to the agreement the stated purpose of the partnership was as follows: The partnership is formed for the purpose of leasing land, raising of agricultural crops, feeding and marketing cattle. In pursuance of such purpose it may perform all functions, in any way related to the fulfillment thereof, including, but not limited by the following: (a) Entering into leases of agricultural land. (b) Entering into contracts for the production and marketing of agricultural crops on the leased land. (c) Acquisition of feeder cattle and contracting for the feeding thereof. (d) Advance contracting in cattle, grain and commodities futures trading. (e) Purchase of commercial paper and short-term United States Government obligations. In the original partnership agreement the profits and losses were to be allocated as follows: (a) One hundred percent (100%) of the net profits *170 and losses of the Partnership for the period ended December 31, 1974, shall be shared or borne by the Limited Partners (on a cash basis) that are not in excess of their capital contributions subject, however, to the limitation of liability of the Limited Partners provided for in section 8 of the Agreement. The General Partner shall bear any losses in excess of the capital contributions of the Limited Partners. (b) The net profits for the period ending December 31, 1975 or earlier if the partnership is terminated before that date, shall be allocated to the Limited Partners to the extent of any prior losses allocated to the Limited Partner plus a one percent (1%) per month return on the initial capital contribution. (c) After allocations of profits as covered in (b), the General Partner shall be allocated the next eight hundred thousand dollars ($800,000.00) of net profits as a management fee plus an incentive bonus. (d) Any remaining net profits after the allocation in subpart (c) of Paragraph 7 will be allocated Fifty percent (50%) to the General Partner and Fifty percent (50%) to the Limited Partners. On December 26, 1975, the partnership agreement was amended effective as *171 of January 1, 1975 by changing the above allocation to the following: (a) The General Partner shall be allocated fifty percent (50%) of the net profits computed per each lot of cattle or crop produced by the Partnership. The allocation of the net profits to the General Partner shall be made only after the lot of cattle or crop is sold and the net profit can be accurately determined. (b) One hundred percent (100%) of the net profits and losses of the Partnership shall be shared or borne by the Limited Partners (on a cash basis) except for any allocation made to the General Partner * * * that are not in excess of the Limited Partners capital contributions subject, however, to the limitation of liability of the Limited Partners provided for in Section 8 of this Agreement the General Partner shall bear any losses in excess of the capital contributions of the Limited Partners. With respect to F.O.B. petitioners' capital contributions, withdrawals and allocations of profits and losses for 1974 and 1975 were as follows: Bennett
O'Dell
Frankenberger
Total
1974: Initial Contributions
$270,000 $270,000 $270,000 $810,000 Year-end capital
$270,000 $270,000 $270,000 $810,000 account
Allocation
33 1/3% 33 1/3% 33 1/3% 100%   1975: Withdrawals
<78,600>
<78,600>
<78,600>
<235,800>
Contributions
110,965 80,000 125,000 315,965 Year-end capital
account
302,365 271,400 316,400 890,165 Allocation
34%   30%   36%   100%   *172 From the initial capital contributions totaling $810,000 F.O.B. made the following payments to Jackson Farming during December of 1974: Payment
Date
Amount
12/11/74
$147,856
12/24/74
302,037
12/26/74
62,076
Total
$511,969
The payment of December 11, 1974 to Jackson Farming was made on an invoice from Jackson Farming setting forth the 1974-1975 expenses for the following crops: Crop
Acres
Expense
Alfalfa
66
$ 20,328
New Alfalfa
66
30,426
New Asparagus
23
13,202
Beets
35
19,355
Onions
85
56,355
Wheat-Single
30
8,190
Total
305
$147,856
The dates upon which these crops had been planted and their projected harvesting dates were as follows: Projected
Planted
Harvesting
Alfalfa
Sept.-Nov. 1974
Mar.-Oct. 1975
New Alfalfa
Sept.-Nov. 1974
Mar.-Oct. 1975
New Asparagus
Jan.-April 1974
Jan.-April 1975
Beets
Sept.-Oct. 1974
April-July 1975
Onions
Oct.-Nov. 1974
Mar.-May 1975
Wheat
Dec. 1-15 1974
Mar.-July 1975
Attached to the invoice was a computer sheet listing the projected expenses of each crop for such items as fertilizer, labor, insecticides, herbicides, and irrigation *173 for the entire crop year of 1974-1975. These expenses had been paid or were at least incurred by Jackson Enterprises prior to F.O.B.'s payment. The payment of December 24, 1974 to Jackson Farming of $302,037 was made on an invoice from Jackson Farming setting forth the projected expenses for the following unplanted crops: Projected
Crop
Acres
Expense
Cotton-Single
35
$ 19,425
Cotton-Rotation
70
38,850
Cantaloupes-Spring
35
15,155
Tomatoes-Single
71
42,245
Tomatoes-Rotation
355
211,225
Wheat-Rotation
140
37,213
Total
706
$364,113
These crops were to be planted and harvested during the 1974-1975 crop year as follows: Projected
Projected
Planting
Harvesting
Crop
Date
Date
Cotton-Single
Mar.-Apr.
Oct.-Jan.
Cotton-Rotation
Mar.-Apr.
Oct.-Jan.
Cantaloupes-Spring
Mid Dec.-Jan.
May-July
Tomatoes-Single
Jan.-Feb.
June-July
Tomatoes-Rotation
Jan.-Feb
June-July
Wheat-Rotation
Dec. 1-15
May-July
The payment of December 26, 1974 to Jackson Farming of $62,076 represented the projected labor expenses for planting and cultivating the above crops. The records of Jackson Enterprises indicate that *174 all of the crops in which F.O.B. had an interest were "pooled" crops except milo. With respect to a pooled crop, the investor did not own any specific acreage of the crop. Instead, the investors in the pool shared the expenses and the profits or losses according to their investment percentages. A comparison of the acres budgeted for planting by Jackson Farming in the 1974-1975 crop year with the acres actually planted for such year as determined by Touche-Ross, Jackson Enterprises' accounting firm, is set out below: Jackson Farming's
Touche-Ross's
Crop
Projections
Determination
Alfalfa
66
[6] 126   Alfalfa New
66
Asparagus New
23
0
Beets
35
35
Onions
85
57
Wheat Single
30
[7] 178   Wheat Rotation
140 Cotton-Single
35
[8] 99  Cotton-Rotation
70
Spring Cantalopes-Rotation
35
24
Tomatoes-Single
71
[9] 99  Tomatoes-Rotation
355 Milo
0
70
Total
1,011   688
In 1975, Jackson Farming [10] made payments to F.O.B. as follows: Payment
Payments
Date
Check #
Amount
to Date
February 10
4592
$620.69
$620.69
February 21
4682
417.24
1,037.93
June 17
5401
12,929.28
13,967.21
July 14
5625
29,059.88
43,027.09
August 20
5960
42,893.73
85,920.82
September 23
6174
185,536.17
271,456.99
October 17
6397
50,000.00
321,456.99
October 23
6463
100,000.00
421,456.99
December 31
6945
138,374.49
559,831.48
Checks to F.O.B.
559,831.48
Checks from F.O.B.
511,969.00
Interest - Dec.
47,862.48
Ck# 6945
*175 The payments of October 17 and October 23 were designated as "Investors Remittance, Non-Crop" on Jackson Enterprises' general ledger, as well as on its check stubs. In Jackson Enterprises' cash disbursements journal the payment of December 31 is shown in two amounts: $90,512.01 as "Investors Remittance, Non-Crop" and $47,862.48 as "Interest." From the initial capital contributions totaling $810,000 F.O.B. also made the following payments to Jackson Feed Mill during December of 1974: Payment
Date
Amount
12/11/74
$122,000
12/24/74
176,030
Total
$298,030
According to F.O.B.'s records the above payments constitute prepaid cattle feed to the extent of $147,788 and the balance of the payments represents the estimated expenses of growing the following feed items: Crop
Acres
Costs
Planted
Harvested
New Alfalfa
280
$ 99,002
Late Sept.-Nov.
Mar.-Oct.
Wheat-Single
280
$ 51,240
Dec. 1-15
Mar.-July
Total
560
$150,242
In 1975 F.O.B. received checks from Jackson Feed Mill in the amounts and bearing the dates and notations shown *176 below: Check
Date
Amount
Description
January 7
$60.00
None
March 5
40,000.00
Lot BS-1
April 17
10,427.30
Cost Reimbursement
May 2
10,000.00
Unknown
May 14
16,639.93
Unknown
June 2
17,000.00
Cattle Sales
June 13
10,000.00
Cattle Revenue
July 7
26,000.00
Unknown
August 1
10,000.00
Current Maturities of
Unsecured Notes Payable
August 4
16,000.00
F.O.B. & LP, Ltd.
November 21
Sales 141,902.77
161,944.13
Profit 20,041.36
The August 1 and August 4 payments were debited by Jackson Feed Mill to "Current Maturities of Unsecured Notes Payable, F.O.B." The payment of November 21 was classified by Jackson Feed Mill as "Sales" to the extent of $141,902.77 and as "Profits" to the extent of $20,041.36. In 1975, F.O.B. paid Jackson Feed Mill the following amounts: Date
Amount
October 29
$ 50,000
November 24
67,480
December 5
75,000
December 7
25,000
Total
$217,480
In 1975 F.O.B. also paid $50,000 on December 28 to Bank of America and $138,374.49 to Jackson Farming on December 31. In 1975 F.O.B. deposited in its account with Imperial Yuma Production Credit Association ("PCA") the following amounts: *177 Date
Amount
October 1
$185,536.17
October 17
50,000.00
October 29
50,000.00
November 17
50,000.00
November 24
2,519.70
Total
$338,055.87
PCA made the following payments in 1975 to Jackson Enterprises out of F.O.B.'s account: Date
Payee
Description
Amount
November 24
Jackson Feed Mill
Purchase of Lots
$363,856.72
F.O.B. 1-13 -
$247,197.04 plus
Feed purchases
Through November 10
of $102,379.11 and
Crossing charges
of $14,280.57
December 5
Jackson Feed Mill
Feed charges for
29,892.29
November 21 to
November 30
December 9
Cargill, Inc.
Purchase of
296,874.99
1,666,666
pounds of grain
December 29
Jackson Feed Mill
Feed charges for
34,080.43
December 1 and
December 28
Total
$724,704.43
The purchase on November 24 of Lots F.O.B. 1-13 represented 2,171 head of cattle. The purchase was not only evidenced by P.C.A.'s payment, but also by 13 bills of sale bearing F.O.B.'s account number with P.C.A. With respect to these cattle F.O.B. was charged by Jackson Feed Mill with feed, head day taxes, medical costs, and other expenses from November 28, 1975 until *178 the cattle were eventually sold in 1976. The payment of December 28 to Bank of America represents the amount of rent due under a one-year lease on 15,000 acres of Mexican pastureland which F.O.B. entered into on November 1, 1975 with Gabriel Maldonado Molina. On April 19, 1976, Jackson Enterprises filed a proceeding under Chapter 11 of the Bankruptcy Act in the United States District Court for the Southern District of California and its farming and cattle operations were taken over by C.A.O. C.A.O. also replaced Jackson Enterprises as F.O.B.'s general partner. On October 1, 1976, Bennett transferred his interest in F.O.B. to Andrew Willis. In spite of these changes, the operations of both F.O.B. and Jackson Enterprises continued in approximately the same manner through the end of 1977. On its partnership return for 1974, F.O.B. reported no income but claimed an operating loss of $810,018, which was represented by the following expenses: Items
Amount
Labor Hired
$ 82,364
Repairs, maintenance
12,360
Rent of farm, pasture
124,325
Feed purchased
147,807
Seed, plants purchased
176,143
Fertilizers, lime
67,884
Machine hire
74,213
Utilities
11,430
Sublet
5,630
Insecticides
33,513
Herbicides
19,859
Chemical
939
Pollination
350
Miscellaneous
10,780
Entomological
3,081
Farm management
23,575
General & administrative
15,765
Total deductions & operating loss
$810,018
*179 On its partnership return for 1975, F.O.B. reported income of $945,588 and deductions of $955,703 for a loss of $10,115. The income and deductions were reflected on the return as follows: Sales of Livestock
and Produce
Kind
Amount
Cattle
$147,788 Grain
797,800 Gross Profit
$945,588 Farm Deductions
Labor Hired
$ 54,858 Rent of farm, pasture
191,580 Feed purchased
532,870 Seed, plants purchased
42,330 Fertilizers, lime, chemicals
34,253 Machine hire
39,990 Freight trucking
14,281 Bank Charges
40 Water
17,035 Insecticides
17,145 Herbicides
8,434 Chemical Analysis
2,515 Entomologist
372 Total Deductions
$955,703 Net farm loss
($10,115)
OPINION Payments Made by F.O.B. in 1974
The first issue for decision is whether the 1974 payments made by F.O.B. to Jackson Farming and Jackson Feed Mill in 1974 were for growing crops and prepaid cattle feed or were loans. Respondent, in his notices of deficiency, determined among other things, that petitioners failed to establish that F.O.B. was in the trade or business of farming or that F.O.B. actually had an interest in Jackson *180 Enterprises' agricultural activities. At trial and on brief, respondent contended more specifically that the $810,000 transferred by F.O.B. to Jackson Farming and Jackson Feed Mill in 1974 were in fact loans, though ostensibly made in payment for growing crops and prepaid cattle feed. Petitioners argue that the $810,000 represented bona fide payments for growing crops and prepaid cattle feed. On this issue respondent's determination is presumptively correct and petitioners have the burden of proof. . From a careful examination of the entire record we are compelled to conclude that petitioners have failed to carry their burden on this issue. First, we note that on the books and records of Jackson Farming the payments made to F.O.B. on October 17 and October 23, 1975, as well as the payment of December 31, 1975 to the extent of $90,512.01 were entered as "Investors Remittance, Non-Crop." These entries clearly demonstrate that the original transfers by F.O.B. to Jackson Farming for estimated crop expenses exceeded the actual expenditures for such purposes. Consequently, even if we assume that the transfers were intended as *181 payments of crop expenses at least a portion of the transfers, i.e., the excess over actual expenditures are nondeductible. Secondly, we note that the payment of December 31, 1975 was classified as "interest" by Jackson Farming to the extent of $47,862.48 which amount closely approximates the total of interest at one percent per month (or 12 percent per year) on each payment made by Jackson Farming to F.O.B. in 1975 from January 1, 1975 to the date each payment was made. [11] The difference between interest calculated in the above manner at one percent per month and that part of the payment of December 31, 1975 which was classified by Jackson Farming as interest is so small (about $450) that it could easily be attributable to a miscalculation of only a few days with respect to one of the larger payments. Furthermore, the record contains no logical explanation for the fact that Jackson Enterprises kept a running balance of the payments made to F.O.B. during 1975. The absence of such explanation leads to an inference that the running balance was kept by Jackson Farming so that the final payment in 1975 would exceed F.O.B.'s total payments to Jackson Farming in 1974 by the $47,862.42 *182 which Jackson Farming classified as "interest." Thirdly, we note that the books and records of Jackson Feed Mill do not support petitioners' contention that the payments made to Jackson Feed Mill by F.O.B. in 1974 were for the purchase of cattle feed. The check stubs of Jackson Feed Mill for its payments to F.O.B. of August 1 and August 4 in the amounts of $10,000 and $16,000, respectively, reflect that the payments were made for "current maturities of unsecured notes payable." Again the record contains no logical explanation for this entry which is directly contrary to petitioners' contention. Furthermore, on the records of Jackson Feed Mill its payment of November 21, 1975 in the amount of $161,944.73 is entered as "sales" to the extent *183 of $141,902.77 and as "profits" to the extent of $20,041.36. When that portion of this payment which is classified as profits is excluded from the total payments made to F.O.B. in 1975 the balance of such payments is equal to the payments made by F.O.B. to Jackson Feed Mill in 1974 and reflected on F.O.B.'s 1974 partnership return as growing costs and prepaid cattle feed. Here again we cannot conclude that the total paid out by F.O.B. in 1974 is only coincidentally equal to the total repaid by Jackson Feed Mill in 1975 especially where the excess is labeled profits and closely approximates one percent per month on each payment from January 1, 1975 to the date of payment. [12]
Additional support for respondent's *184 determination that F.O.B.'s 1974 payments to Jackson Feed Mill were not for prepaid cattle feed is found in the lot folders, weight tickets, and other records of Jackson Feed Mill for 1975. These documents contain no evidence that F.O.B. owned or sold any cattle prior to the purchase of 2,171 cattle in Lots F.O.B. 1-13 in November of 1975. The conclusion that this was about the date of F.O.B.'s first participation in the cattle operation is not only supported by this purchase which is clearly evidenced by P.C.A.'s payment to Jackson Feed Mill from F.O.B.'s account and the bills of sale for the cattle but also by the execution of the lease on the Mexican pastureland on November 1, 1975, and Jackson Feed Mill's charges for head day taxes, medical costs, and other expenses for November of 1975. The record contains no other evidence of any ownership of cattle by F.O.B. prior to these transactions with the exception of the questionable testimony discussed below. Petitioners would have us disregard the above facts and the conclusion which they tend to support. Instead, petitioners point to entries made in F.O.B.'s books, certain trial testimony, selected portions of the books and records *185 of Jackson Enterprises, and an accounting statement by Touche-Ross. Admittedly the sketchy books and records of F.O.B. do reflect that the payments made in 1974 to Jackson Enterprises were for growing crops and prepaid cattle feed. However, book entries alone do not determine the characterization of disputed transactions. This is especially true where, as here, there is a discrepancy in the manner in which a transaction is characterized by the parties. In this case the classification by Jackson Feed Mill of some of its payments to F.O.B. in 1975 as investors remittance-non-crop, interest, and current maturities of unsecured notes payable cannot be reconciled with F.O.B.'s classification of such payments as proceeds from the sale of cattle and crops. Under these circumstances we are unable to attribute much weight to the manner in which F.O.B. recorded the transactions in its records. The testimony of petitioners' witnesses is also unpersuasive. Such testimony had two recurring themes: first, conclusory statements to the effect that the payments from F.O.B. to Jackson Enterprises in 1974 were not loans and the payments from Jackson Enterprises to F.O.B. in 1975 were not loan *186 repayments, and second, similar statements to the effect that F.O.B. purchased prepaid feed in 1974, purchased cattle early in 1975 and fed the prepaid feed to the cattle. As to the first line of testimony, O'Dell, as well as Chris Jackson and John Jackson, two of the principals in Jackson Enterprises, testified that F.O.B.'s payments were not loans but were payments for bona fide farming and cattle operations. However, only John Jackson offered any explanation why the payments of October 17, October 23 and December 31, 1975 to F.O.B. were characterized at least in part as "investors remittance, non-crop" and "interest." He testified that while he did not know why the checks bore these notations, David Wells and Tim McCabe, employees of Jackson Enterprises, were responsible for breaking the payments down and determining how they were classified. Wells and McCabe did not testify and the record contains no explanation for their absence. Under these circumstances an inference can be drawn that if called their testimony would have been unfavorable to petitioners. , affg. . *187 None of petitioners' witnesses attempted to explain why Jackson Feed Mill characterized its payments of August 1 and August 4, 1975 to F.O.B. as "current maturities of unsecured notes payable" or its payment of November 21 as "profits". Furthermore, the mere uncorroborated assertions of O'Dell, Chris Jackson and John Jackson that F.O.B.'s payments in 1974 were not loans are not sufficient to support a finding to that effect because each of these witnesses has a direct interest in these consolidated cases. O'Dell, Chris Jackson and Hipolito Magana, Jackson Feed Mill's bookkeeper, all testified in general terms along the second line of testimony. More specifically, they testified that as early as February 18, 1975 F.O.B. acquired Lot FOB-3 and it was to these cattle that the prepaid feed was fed in early 1975. However, this testimony is contradicted by the documents of a third party, P.C.A., from which we are convinced and have found that lot FOB-3 along with the other lots FOB 1-2 and 4-13 were not acquired until November 1975. The testimony is further refuted by Robert E. Nelson, respondent's agent, who testified in an honest and forthright manner, that in the course of his audit *188 O'Dell informed him that F.O.B. owned no cattle in the early part of 1975 and that it sold all of the prepaid feed back to Jackson Feed Mill at cost. Finally, petitioners point to the report prepared by Touche-Ross as proof positive that crops were planted on F.O.B.'s behalf during the 1974-1975 crop season. The report does reflect that F.O.B. had an interest in pooled crops during the 1974-1975 crop season. However, the report alone is hearsay and in the absence of testimony by an appropriate person from Touche-Ross as to how and why the report was prepared it is not sufficient to support a finding on this point in favor of petitioners. From all of the above, we have concluded as stated previously that petitioners have failed to carry their burden of proving that F.O.B.'s transfers in 1974 to Jackson Farming and Jackson Feed Mill were not loans as determined by respondent. Consequently, we need not consider the second issue as to whether these amounts constitute deductible growing costs or feed expenses. Feed and Crop Expenses for 1975
On its 1975 partnership return, F.O.B. deducted $532,870 for feed expense and $422,833 for labor, seed, fertilizer, land rental, *189 utilities, herbicides, and other expenses. Respondent concedes that petitioners are entitled to deduct the $477,507 in feed payments made by P.C.A. out of F.O.B.'s account. However, respondent contends that petitioners have failed to substantiate the $55,363 in additional feed expenses ($532,870-$477,507). With regard to the $422,833 in other expenses claimed by F.O.B., respondent contends that, even if these expenses were paid, petitioners have failed to establish that such amounts are deductible. From the record as a whole, we are convinced and, in fact, respondent has conceded that F.O.B. was in the cattle business after October 1975. Consequently, in addition to the $477,507 which respondent has conceded was paid for feed in 1975, we have found that F.O.B. made a $50,000 payment to Bank of America for the lease of Mexican pastureland for one year commencing on November 1, 1975. Even though the lease extended into 1976 the entire payment is deductible in 1975. See , reversing . See also , affd. . *190 F.O.B.'s relationship to Jackson Enterprises changed in 1975 as clearly appears from the lack of payments in 1976 by Jackson Farming to F.O.B. having either the form or substance of principal and interest. Consequently, with regard to its farming operations we are convinced that FOB was engaged in the business of farming by November 1975. Furthermore, we have found that payments were made by P.C.A. on behalf of F.O.B. to Jackson Enterprises totaling $724,704.43. Respondent has conceded that $477,507 of the payments made by P.C.A. qualify as deductible feed expenses. In addition to the $477,507 conceded by respondent we have found that F.O.B. is entitled to deduct another $50,000 for pasture rent. We have also found that on December 31, 1975 F.O.B. paid Jackson Farming $138,374.49. The record, however, does not contain sufficient relevant and competent evidence from which we can make specific findings with regard to F.O.B.'s expenses for labor, water, herbicides, fertilizer, machine hire and other farming expenses. Nevertheless since we are convinced that farm expenditures did occur prior to the end of 1975 and being satisfied that some deduction should be allowed, and following *191 the principle of and bearing heavily against the petitioners we conclude that a reasonable allowance for all such expenditures in excess of the $138,374.49 is $75,000 and we so find. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith for trial, briefing and opinion: Byron D. Frankenberger and Beverly J. Frankenberger, docket No. 29259-81; Robert L. O'Dell and Carol E. O'Dell, docket No. 29029-81, and C.A.O. Corporation, docket No. 29030-81.↩
3. The parties have stipulated that F.O.B. had ordinary losses of $25,719 for 1976 and $271,433 for 1977. With respect to 1977, respondent contends and petitioners do not argue otherwise that the respective loss allocations of Frankenberger and O'Dell are 40.7 percent and 26 percent. With respect to 1977, respondent also contends that Frankenberger has failed to establish what, if any, loss he is entitled to from F.O.B. We do not address this contention, however, since his liability for 1977 was not covered by the deficiency notice and is not before us.↩
4. All references to Bennett, Frankenburger or O'Dell in the singular are to male petitioners.↩
5. The head day tax is a monthly inventory tax assessed on the cattle's owner by the state.↩
6. Includes all alfalfa. ↩
7. Includes all wheat. ↩
8. Includes all cotton. ↩
9. Includes all tomatoes.↩
10. The payments were actually made by Jackson Enterprises on behalf of Jackson Farming.↩
11. Interest computed in this manner is $47,411.81 as set out below: ↩
Date
Amount Repaid
12% Interest
February 10
$ 620.69
$ 8.39
February 21
417.24
7.15
June 17
12,929.28
711.82
July 14
29,059.88
1,858.55
August 20
42,893.73
3,266.52
September 23
185,536.17
16,208.93
October 17
50,000.00
4,763.74
October 23
100,000.00
9,725.27
December 31
90,512.01
10,861.44
Total
$511,969.00
$47,411.81
12. Interest computed in this manner is $22,399.91 as computed below: ↩
Date
Amount Repaid
12% Interest
January 7
$ 60.00
$ 00.14
March 5
40,000.00
843.00
April 17
10,427.30
367.82
May 2
10,000.00
402.20
May 14
16,639.93
735.08
June 2
17,000.00
857.47
June 13
10,000.00
540.66
July 7
26,000.00
1,611.43
August 1
10,000.00
698.90
August 4
16,000.00
1,139.34
November 21
141,902.77
15,203.87
Total
$298,030.00
$22,399.91